**UNITED STATES of America, Appellee,**

v.

**Fred DAVIS, Appellant.**

**Nos. 23132, 23133.**

United States Court of Appeals
Ninth Circuit.

Oct. 24, 1969.

Charles S. Stout (argued), Boise, Idaho, for appellant.

Clarence D. Suiter (argued), Asst. U. S. Atty., Jay F. Bates, U. S. Atty., Boise, Idaho, for appellee.

Before MERRILL, DUNIWAY and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

Appellant Davis, in two consolidated cases,[1] was convicted by a jury of seven counts of securities fraud (15 U.S.C. § 77q (a)), five counts of mail fraud (18 U.S.C. § 1341) and one count of conspiracy (18 U.S.C. § 371). This appeal challenges the admissibility and weight of the evidence and asserts several procedural errors. We affirm.

Davis makes five contentions of error. (1) The court erred in refusing to grant him a separate trial from co-defendant Carl Harrison, Jr.; and that Harrison's statement to an S.E.C. investigator was erroneously received in evidence in violation of the holding in Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. (2) The court erred in reading the information to the jury after Davis had moved to strike passages of it as prejudicial. (3) The evidence was inadequate to support the verdicts and to show the specific criminal intent required for conviction. (4) The court should have granted the motion for acquittal. (5) The court should have granted the motion for new trial. Davis' briefs do not separately support the last two contentions. We treat them as standing or falling with the more specific allegations of error.

## THE FACTUAL SETTING

The charges arose out of the participation of Davis, Harrison and Michael Boulds in a series of Idaho business enterprises. Between 1963 and 1966 Davis helped promote and control Mid-Day Dew, Inc., Command Products, Inc., and Command Products, Ltd., a common law trust. While there were differences in form between the three enterprises, the evidence indicated that essentially only one business was involved, with the form changing primarily for promotional advantage. The stated purpose of all three businesses was the development and marketing of various types of cleansing tissue.

Financing for all enterprises was provided by investors recruited by Harrison, Davis and Boulds. Typically subscribers would be asked to invest in return for Davis' promissory note and shares of stock. As Davis explained

1. There are two docket numbers in this appeal. Originally Davis pleaded not guilty to all counts of an indictment. Later he changed his plea to guilty on two of the counts. The other counts were then dismissed. Still later Davis withdrew his guilty pleas. The previous counts were then realleged in a separate information. The charges of the indictment and information were tried together.

it, the note guaranteed repayment and the shares were a bonus. During the marketing of the notes and shares, Davis or Harrison or both made the misrepresentations on which these actions are based. While the specific misrepresentation varied according to the enterprise promoted and the prospective purchaser, the substance of the misstatements together with the actual situation, can be summarized.

(1) The promoters claimed that all money subscribed would be used exclusively to produce and market the corporate products; none would be used for personal expenses. In fact, the majority of the money was appropriated to personal use by Davis, Harrison and Boulds.

(2) Davis stated he was selling his own stock. In fact, Davis did not hold much stock in the businesses. Further, he did not reveal the ownership interest of others in his sales attempts.

(3) Davis claimed he had invested everything he had in the businesses. In fact, his investment was minimal.

(4) The corporations were protrayed as on the verge of being ready to market their products based on substantial recent progress and the establishing of several distributorship agreements. In fact, most progress was imaginary.

(5) It was represented that Mrs. Ernest Hemingway, widow of the famous author, and Harmon Killibrew, a prominent professional baseball player, would be investing in the businesses. In fact, Harrison had contacted them and received non-committal responses.

(6) The investment was described as certain to double the investors' money within a year. It was also talked of as a "sure thing" and one that "couldn't miss." In fact, no dividends have been paid. Nor have repayments on the promissory notes been made. At the time of making such representations there was no factual basis to support such positive assertions.

The dealings by Davis with subscriber Keith Allred are illustrative and typical of the deception practiced. Davis initially phoned Allred saying that a mutual friend had told him of Allred's interest in investment possibilities. An appointment was arranged between Harrison, Davis and Allred at the latter's Salt Lake City home. At the meeting, Davis waxed eloquent over the prospects for Mid-Day Dew. He stated he was the sole owner, never mentioning the real majority shareholder; that business had been so good that the product couldn't be made fast enough to meet the demand. To support this contention, Davis produced a purported list of orders. Davis stated that since he had invested all his money in the corporation, he was forced to seek limited outside funding. Allred was told that Mrs. Hemingway would be backing the business as soon as the product had proven itself on the market. In asking for a loan, Davis promised repayment within a year. The stock would be there as a bonus. Davis further guaranteed that no wages or salaries would be drawn until after the company was showing a profit. Suitably impressed, Allred became a stockholder in the Mid-Day Dew-Command Products businesses.

After investigation by the S.E.C., the three promoters were charged with securities and mail fraud. Michael Boulds pleaded guilty. Harrison and Davis pleaded not guilty and were tried and convicted as charged. Only Davis perfected an appeal.

### THE MOTION FOR SEPARATE TRIAL AND THE BRUTON PROBLEM.

Davis alleges error in the failure of the trial court to grant his motion for separate trial. Rule 14, Fed.R. Crim.P. leaves the decision in the discretion of the trial judge. Here strong arguments of judicial convenience supported the decision not to separately try Harrison and Davis. The trial lasted ten days and involved the introduction of almost 400 exhibits by the government. Thirty two witnesses testified, some coming from considerable distances

to do so. The government's case would have been only slightly less complex if Davis alone had been tried.

Davis claims the indictment was so long and complex that it was impossible to segregate the proofs and defend against the charges. We find no undue complexity. The charges were phrased in the language of the applicable statutes and were clear as to which of the defendants were charged. The length and complexity was not due to the presence of two defendants in the action, but rather to the magnitude of the frauds perpetrated.

Nor is there substantial merit to Davis' claim that testimony was offered which only Harrison, fearful of impeachment for prior convictions, could refute. Davis did not raise this particular objection in his motion for separate trial. Nor is it shown that Harrison would have given testimony favorable to Davis if he had taken the stand. Indeed, the argument in Davis' brief makes it appear likely that Harrison would have been as reluctant to incriminate himself at a separate trial as at a joint one.

Defendant strenuously contends that the ruling of the Supreme Court in Bruton v. United States, supra, makes the admission of testimony of co-defendant Harrison at an examination by Securities and Exchange Commission investigators prejudicial error. Bruton was decided after the trial but since Bruton has been held retroactive, Roberts v. Russell (1968), 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 its teachings must be considered in this case.

In Bruton the Supreme Court considered the admission at a joint trial of one defendant's confession where that defendant did not take the witness stand. The Court held that such a practice violated the other defendant's 6th amendment right to confront the witnesses against him even though the jury was instructed to consider the confession only as evidence against the confessor. The Court regarded the mutually incriminating statement as inevitably prejudicial to the non-confessing party no matter how strongly the judge's limiting instruction was phrased.

In reaching its decision in Bruton, the Court placed great emphasis on the "powerfully incriminating" nature of the confession. The Court observed: "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions * * *," 391 U.S. 123, 135, 88 S.Ct. 1620, 1627.

Recently in Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 the Supreme Court refused to overturn a felony-murder conviction on Bruton grounds. The Court found that the evidence, aside from the prejudicial confessions, was so overwhelming, that the Bruton violation was harmless error beyond a reasonable doubt[2] under the standard of Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065.

2. In Harrington, the white petitioner was tried with three black co-defendants for first degree felony-murder. Petitioner testified that he had been at the scene of the crime; that co-defendant Bosby had fired the fatal shot; that he had fled with the other defendants, and that he had later attempted to disguise his appearance. A number of eyewitnesses placed petitioner at the scene of the crime. Two, however, had previously told the police that four Negroes had committed the crime. Defendant Rhone's confession was introduced. It placed Harrington inside the store with a gun at the time of the crime. Rhone took the stand and was cross examined by Harrington's counsel. Confessions of defendants Cooper and Bosby were also introduced. Both referred to Harrington as "the white guy" without naming him and both placed "the white guy" at the scene of the crime. Neither, however, testified as to "the white guy" having a gun. Neither Cooper nor Bosby took the stand and their inability to be cross-examined was the basis of Harrington's Bruton claim. The Supreme Court reasoned that the confessions of Cooper and Bosby merely added to a wealth of other evidence, sufficient in itself to convict Harrington.

Several circuit court decisions also indicate that alleged *Bruton errors* need not always be grounds for reversal. Two theories have been used to reach such conclusions. One line of cases stresses that the questioned evidence was not incriminating to the objecting party. United States v. Hoffa (7 Cir. 1968), 402 F.2d 380 (statements of one defendant to a Congressional investigating committee involved matters about which there was no substanial dispute and no possibility of incrimination of other defendants); Cortez v. United States (9 Cir. 1968), 405 F.2d 875 (statement "I told them something was going to go wrong" held not incriminating); and Clark v. United States (9 Cir. 1969), 412 F.2d 491. The alternate approach stresses the sufficiency of other evidence, reaching the same conclusion as *Harrington* where overwhelming independent evidence of guilt is present. Posey v. United States, 416 F.2d 545 (5 Cir. 7/17/69); United States v. Levinson (6 Cir. 1968), 405 F.2d 971; Ignacio v. People of Territory of Guam, 413 F.2d 513 (9 Cir. 7/7/69).

■ Davis' claim of *Bruton* error should be disallowed under either standard. Harrison's testimony was clearly not a confession inculpating Davis. The testimony was given to an S.E.C. investigator in the presence of Harrison's attorney. Full self-incrimination warnings were given before the start of the interrogation. Harrison apparently viewed the proceedings as an opportunity to convince the government that no criminal wrong doing had taken place. His testimony in the main attempted to exonerate both Davis and himself. Harrison flatly denied making several of the specific misrepresentations charged in the information and indictment. He further explained other statements as being phrased in terms of opinion rather than fact. He denied knowledge of Davis' financial situation. While Harrison did admit that corporate funds had been used for personal living expenses, this statement mirrored

statements made by Davis at a similar S.E.C. interrogation and placed in evidence against him at the trial.

Overwhelming evidence supported the guilt of Davis aside from the admission of Harrison's testimony. The government's witnesses detailed the numerous misrepresentations, contrasting them with the true state of affairs. In the face of such clear proof, any error in the admission of Harrison's testimony was harmless to Davis beyond a reasonable doubt. Harrington v. California, supra.

## II

## MOTION TO STRIKE FROM THE INFORMATION

■ Davis urges as error the failure to strike the following portions of the information before reading it to the jury.

"(2) That investors who had purchased stock in other business ventures promoted by Boulds, Davis or Harrison, including Quenzer & Co., Inc., Mid-Day Dew, Inc., Drop Shopper, Inc., and Command Products, Inc., had little or nothing of value to show for the money they had invested."

"* * * That in the light of past experiences of Boulds, Davis and Harrison, an investment in said securities could not be considered safe and secure, and that they had no reasonable basis for representing that investors would receive returns in any amount on their investments within the foreseeable future, or at all."

Davis claims the material is not relevant and highly prejudicial. However, he presents no argument in support of this position. The government correctly points out that the objectionable paragraphs pertain to matters of fact not disclosed to investors, which if disclosed, may have been highly significant in an investment decision. As such, the state-

ments were relevant to the charges against Davis and not prejudicial.

### III

### SUFFICIENCY OF THE EVIDENCE

Davis' final contention is that the *evidence was insufficient* to convict or to show criminal intent. Counsel attempts to picture Davis as a well-intentioned optimist whose only mistakes were ones of business judgment. The jury clearly did not consider this an accurate picture. Nor do we. There was ample evidence to prove Davis was guilty of more than innocent over-promotion. The record shows repeated and material misrepresentations of fact were made to persuade hesitant investors to fund a series of business ventures of dubious merit.

We find no error under the contentions made by Davis. To the contrary the district judge properly and ably handled the conduct of a long and complex trial.

The judgment is affirmed.